## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| WESTERN ENERGY COMPANY<br>9540 S. Maroon Circle, Suite 300<br>Englewood, Colorado 80112,<br><br>          Plaintiff,<br><br>v.<br><br>DAVID BERNHARDT, in his official capacity<br>as Secretary of the Interior<br>U.S. Department of the Interior<br>1849 C Street NW<br>Washington, DC 20240<br><br>and<br><br>U.S. OFFICE OF SURFACE MINING<br>RECLAMATION AND ENFORECEMENT<br>1849 C Street NW<br>Washington, DC 20240<br><br>          Defendants. | Case No. _____ |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Western Energy Company ("Western Energy"), through its counsel, brings this action for declaratory and injunctive relief against Secretary of the Interior David Bernhardt (the "Secretary") and the U.S. Office of Surface Mining Reclamation and Enforcement ("OSM") (collectively, "Federal Defendants"):

## **INTRODUCTION**

1.      Western Energy submits this Complaint in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h.

2.      This action arises out of Federal Defendants' June 2019 Record of Decision ("ROD") approving Western Energy's mining plan modification for the permit area numbered C2011003F, commonly known as "Area F" at the Rosebud Mine, which is an existing 25,949-acre surface coal mine near Colstip, Montana.

3.      Federal Defendants erroneously excluded from the approval of Western Energy's mining plan modification for Area F approximately 74 acres of mineable Federal coal located within Township 2 North, Range 38 East, Section 12 (referred to as "Section 12").  Federal Defendants excluded Section 12 from Western Energy's mine plan after erroneously incorporating the Montana Department of Environmental Quality ("MDEQ") April 12, 2019 Written Findings, which first excluded Section 12 upon finding that a change in water quality in the Rosebud Coal outside the permit boundary could result in material damage outside the permit area, warranting exclusion of Section 12.  MDEQ's finding, and Federal Defendants' adoption of same, is unsupported by the record and contrary to the analyses in the Environmental Impact Statement ("EIS") prepared by Federal Defendants and MDEQ to analyze the environmental impact of Area F in accordance with NEPA because the EIS did not consider an alternative mining scenario excluding the 74 acres.

## JURISDICTION AND VENUE

4.      This action arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the APA, 5 U.S.C. §§ 701-706.  This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the laws of the United States); 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed plaintiff); and 5 U.S.C. §§ 701-706 (APA).

5.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 1361, 2201-2202 and 5 U.S.C. §§ 705–706.

6.    Venue is proper under 28 U.S.C. § 1391(e) as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority, and a substantial part of the events giving rise to the claims occurred in the District of Columbia.

7.    The challenged actions are final and subject to judicial review under 5 U.S.C. §§ 702, 704, 706.

## PARTIES

8.    Plaintiff WESTERN ENERGY COMPANY ("Western Energy"), is a wholly-owned subsidiary of Westmoreland Coal Company ("Westmoreland") and is located in Englewood, Colorado.  Western Energy owns and operates the Rosebud Mine, a surface coal mine located approximately 12 miles west of Colstrip, Montana that produces low-sulfur subbituminous coal.

9.    Defendant DAVID BERNHARDT, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior and, in that capacity, is ultimately responsibile for implementing and complying with federal laws governing mining plan modifications, including NEPA, the Surface Mining Control and Reclamation Act ("SMCRA"), and the Mineral Leasing Act ("MLA").  He is sued in his official capacity.

10.    Defendant U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT ("OSM") is a federal agency within the U.S. Department of the Interior that is responsible for assuring lawful environmental review of mining plan modifications under NEPA

and recommending approval, conditional approval, or disapproval of applications for mining

plan modifications.

## FACTUAL ALLEGATIONS

### I.    National Environmental Policy Act

11.    "NEPA is our basic national charter for the environment." 40 C.F.R. § 1500.1(a).

NEPA serves the dual purposes of informing agency decision makers of the environmental

effects of proposed federal actions and ensuring that relevant information is made available to

the public so that it "may also play a role in both the decisionmaking process and the

implementation of that decision." *See Robertson v. Methow Valley Citizens Council,* 490 U.S.

332, 349 (1989).

12.    NEPA's intent is to focus the attention of agencies and the public on a proposed

action so its consequences may be studied before implementation.  42 U.S.C. § 4321; 40 C.F.R.

§ 1501.1; *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

13.    To assist in meeting these goals, NEPA requires preparation of an EIS for "major

Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C.

§ 4332(C); 40 C.F.R. § 1502.3.  The EIS must examine, among other things, "alternatives to the

proposed action," and the project's direct, indirect, and cumulative impacts. 42 U.S.C.

§ 4332(2)(C)(iii); 40 C.F.R. §§ 1502.16, 1508.7.

14.    NEPA also requires that every agency must "study, develop, and describe

alternatives to recommended courses of action in any proposal which involves unresolved

conflicts concerning alternative uses of available resources . . . ."  42 U.S.C. § 4332(E).  NEPA

regulations provide that the alternatives evaluation "is the heart of the environmental impact

statement."  40 C.F.R. § 1502.14.  It should "sharply defin[e] the issues and provid[e] a clear

basis for choice among options by the decisionmaker and the public" based on a consideration of

the direct, indirect, and cumulative environmental consequences of a proposed action.  *Id*. §§ 1502.14, 1502.16.

15.     NEPA regulations do not specify the number of alternatives that need to be considered by federal agencies in the EIS but indicate that a reasonable range of alternatives should be evaluated.  *Id*. § 1502.14.

16.     NEPA requires federal agencies to prepare supplemental environmental documents if substantial changes are made to a proposed action that are relevant to environmental concerns or if there are significant new circumstances or information relevant to environmental concerns.  *Id*. § 1502.9(c).

17.     NEPA regulations direct that Federal Defendants should "encourage and facilitate public involvement."  *Id*. § 1500.2(d).

18.     Ultimately, NEPA's point is "not better documents but better decisions."  *Id*. § 1500.1(c).  "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action.  The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id.*

## II.     Mineral Leasing Act and Surface Mining Control and Reclamation Act

19.     The Secretary of the Interior is responsible for authorizing the mining of federally owned coal through approval of a mining plan or mining plan modification.

20.     The MLA requires the Secretary to approve a mining plan before a federal lessee may take "any action on a leasehold which might cause a significant disturbance of the environment."  30 U.S.C. § 207(c).

21.     Pursuant to SMCRA and its implementing regulations, the Secretary "shall approve or disapprove the [mining] plan or require that it be modified."  30 U.S.C. § 1273(c); 30

C.F.R. § 746.14.  It is standard practice for the Assistant Secretary for Land and Minerals Management ("ASLM") to sign such mining plans on behalf of the Secretary.

22.     Although states, such as Montana, have largely been delegated authority to regulate surface coal mining activities under SMCRA, the law prohibits the Secretary from delegating to states the duty to approve, disapprove, or modify mining plans for federally owned coal.  *See* 30 U.S.C. § 1273(c); *see also* 30 C.F.R. § 745.13(i).  SMCRA also prohibits the Secretary from delegating to states authority to comply with NEPA.  30 C.F.R. § 745.13(b).

23.     While the Secretary is charged with approving, disapproving, or modifying a mining plan, OSM is charged with "prepar[ing] and submit[ting] to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan."  *Id.* § 746.13.

24.     A "mining plan shall remain in effect until modified, cancelled or withdrawn." *Id*. § 746.17(b).  The Secretary must modify a mining plan when, among other things, there is "[a]ny change in the mining plan which would affect the conditions of its approval pursuant to Federal law or regulation[,]" "[a]ny change which would extend coal mining and reclamation operations onto leased Federal coal lands for the first time[,]" or "[a]ny change which requires the preparation of an environmental impact statement under the National Environmental Policy Act[.]" *Id*. §§ 746.18(a), (d)(1), (d)(4)-(5).

25.     Among other things, a mining plan must assure compliance with applicable requirements of federal laws, regulations, and executive orders, and be based on information prepared in compliance with NEPA.  *See* 30 C.F.R. § 746.13.  For example, the MLA compels OSM to select a mining plan that maximizes coal recovery: "no mining operating plan shall be

approved which is not found to achieve maximum economic recovery of the coal within the tract."  30 U.S.C. § 201(a)(3)(C).

**III.    Administrative Procedure Act**

26.    The APA provides a right to judicial review for any "person suffering legal wrong because of agency action."  5 U.S.C. § 702.  Actions that are reviewable under the APA include final agency actions "for which there is no adequate remedy in a court."  *Id.*

27.    Under the APA, a reviewing court shall, inter alia, "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  Agency actions may also be set aside in other circumstances, such as where the action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law."  *Id.* § 706(2)(B)-(F).

28.    To survive review under the APA's arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted).

**IV.    The Rosebud Mine**

29.    The Rosebud Mine is located in Rosebud County and surrounds the city of Colstrip and the Colstrip Steam Electric Station, which is commonly known as the Colstrip Power Plant.

30.    The Rosebud Mine began production in 1968.  In 2001, Westmoreland purchased the Rosebud Mine, and its subsidiary, Western Energy, continues to operate the mine today.  The Rosebud Mine produces 8.0 to 10.25 million tons of low-sulfur (0.64 percent) subbituminous

coal annually and 300,000 tons of high-sulfur "waste coal" annually.  Between 1975 and 2016,

Western Energy recovered a total of 462,192,473 tons of coal from the Rosebud Mine.

31.     Currently, three active mine areas at the Rosebud Mine operate under permits

issued by MDEQ: Area A (4,262 acres, permit C1986003A), Area B (6,231 acres, permit

C1984003B), and Area C (9,432 acres, permit C1985003C).  Two permitted mine areas are no

longer actively mined and are being actively reclaimed: Area D (4,554 acres, permit

C1986003D) and Area E (1,470 acres, permit C1981003E).  Permit Areas D and E of the

Rosebud Mine extend to the east of Colstrip for 3.5 miles, and Permit Areas A, B, and C extend

12 miles to the west of Colstrip.  Existing mining operations are conducted pursuant to valid

existing rights under Federal and private leases.

32.     Western Energy has one Montana Pollutant Discharge Elimination System

("MPDES) Permit (MT-0023965) that covers discharge of mine drainage and drainage from

existing coal preparation areas, coal storage areas, and reclamation areas into 151 outfalls.

33.     The Rosebud Mine is in full compliance with its MDEQ permits.

**V.     Area F**

34.     In November 2011, Western Energy applied for an MDEQ mining permit,

pursuant to the Montana Strip and Underground Mine Reclamation Act ("MSUMRA"), Mont.

Code Ann. §§ 82-4-201 *et seq*., and its implementing rules, ARM 17.24.301-1309, and the OSM

mining plan modification, pursuant to the MLA and SMCRA, to exercise its valid existing rights

in Area F granted by the U.S. Bureau of Land Management ("BLM") under federal coal lease

M82186 and private coal leases G-002 and G-002-A.

35.     Area F is located adjacent to the western boundary of Area C and expands the

mine to the west into Treasure County.

36.     As applied for, the mining plan modification for Area F would add 6,746 permit acres to the Rosebud Mine.  The surface of Area F is entirely privately owned, but the subsurface is both privately (3,479 acres) and federally (3,267 acres) owned.  As proposed, the projected area of surface disturbance within Area F is 4,260 acres.  Of these, 2,159 acres will be disturbed by mining; the remainder will be disturbed by highwall reduction, soil storage, scoria pits, haul-road construction, and other miscellaneous activities.

37.     Although Area F is a new permit area and an expansion of the Rosebud Mine's surface disturbance, Western Energy will not increase the total annual production output of the mine.  At the current rate of production, the operational life of the mine would be extended by 8 years.  Western Energy estimates that 70.8 million tons of recoverable coal reserves exist in Area F and will be removed during the 19-year operations period.

**A.     Environmental Analysis for Area F**

38.     A single EIS was completed in November 2018 by OSM and MDEQ to meet the requirements of NEPA and the Montana Environmental Policy Act ("MEPA"), Mont. Code. Ann. §§ 75-1-101 *et. seq.*, and its implementing rules (ARM 17.4.601 *et seq.*).  The EIS comprises over 800 pages of analysis and required more than six years for its preparation.  OSM estimates the cost of the EIS at $1,805,000.

39.     In the EIS, MDEQ informed the public that it would use the EIS to make a more fully informed decision with respect to the approval of Western Energy's mine permit application for the Area F project area.

40.     In the EIS, OSM informed the public that it would use the EIS to prepare the Mining Plan Decision Document ("MPDD") for the DOI ASLM recommending approval, disapproval, or conditional approval of the Area F mining plan.

41.     Th EIS analyzed in detail three alternative actions:  the No Action Alternative (Alternative 1), the Proposed Action (Alternative 2), and another action alternative (Alternative 3), which modifies the Proposed Action to include additional environmental protection measures beyond those required under the MSURMA.

42.     Under Alternative 1, the federal and private coal in Area F would not be mined because it would be logistically challenging and would not be economically feasible to mine private coal without the federal coal leases in the project area.  Under the No Action Alternative, Western Energy's permit application for Area F would not be approved by MDEQ.  Without an approved state permit, OSM would not make a recommendation to the ASLM regarding a federal mining plan modification for Area F.  Without an approved permit and federal mining plan, Western Energy would not develop the project, resulting in 33,885,390 tons of federal coal not being recovered from lease M-82816 and 37,036,115 tons of private coal not being recovered from private leases G-002 and G-002a.  It would also result in 4,260 acres of previously undisturbed ground not being disturbed.

43.     Under Alternative 2, Federal Defendants would approve the mining plan modification as set forth by Western Energy in its permit application, including the proposed sequence of operations, reclamation plan, measures to protect the hydrologic balance, and proposed monitoring and mitigation measures.

44.     Under Alternative 3, OSM would require Western Energy to implement additional environmental protection measures that are above and beyond the requirements of MSUMRA.  Under this alternative, Western Energy would develop, mine, and reclaim Area F as proposed in its permit application and, for particular areas, comply with OSM-required environmental measures such as development of a water-management plan, additional

requirements for the wetland mitigation plan, and development of practices designed to improve reclamation (soil stockpiling, soil redistribution, and drainage-basin design) and revegetation success for wildlife habitat.  Alternative 3 also includes requirements for a geological survey and paleontology mitigations.

45.     OSM did not consider, analyze, or provide opportunity for public comment on an alternative that would exclude certain acreage, such as the 74 acres in Section 12 ultimately excluded, from the mining plan modification.

**B.     MDEQ Mining Permit**

46.     After nearly eight years, on April 18, 2019, MDEQ issued its Record of Decision ("ROD") and the Comprehensive Hydrologic Impact Assessment ("CHIA"), and Written Findings for Western Energy's mining permit application.  Based on Western Energy's permit application for Area F, and the analysis in the EIS, MDEQ approved Alternative 2 with conditions. Thus, MDEQ approved the Area F Permit.

47.     MDEQ selected Alternative 2 upon finding that it complied with the regulatory requirements of MSURMA, sufficiently protected the resources in the project area and vicinity, met all applicable regulatory requirements, and minimized potential impacts while meeting the proposed project's stated purpose and need.

48.     Relevant to this complaint, one special condition of MDEQ's ROD prohibits mining of approximately 74 acres in Section 12 within Area F.  The special condition provides:

> ARM 17.24.405(6)(c): As described in Section 9.6.5 of the Cumulative Hydrologic Impact Analysis, based on information contained in the permit application, DEQ has determined that the proposed mine plan in T2N, R38E, Section 12 is likely to result in a change in water quality in the Rosebud Coal outside the permit boundary which could result in material damage. As such, the application does not affirmatively demonstrate that the hydrologic consequences and cumulative hydrologic impacts of mining in Section 12 will not result in material damage to the hydrologic

balance outside the permit area. Therefore, in accordance with ARM 17.24.405(4), DEQ does not approve mine passes proposed in T2N, R38E, Section 12. The area excluded from the mine plan is shown in Figure 4.

49.    MDEQ's Figure 4 shows Section 12, the area excluded from the mine plan as

follows:



*Figure 4. Area excluded from mine plan.*

50.    Section 9.6.5 of the Cumulative Hydrologic Impact Analysis ("CHIA"), attached

to MDEQ's ROD, provides that:

> At the far northwest permit boundary, groundwater will most likely flow to the northeast from spoil into unmined Rosebud Coal outside the permit boundary after mining. Based on the water quality observed at nearby Rosebud Coal sourced Spring 7, DEQ conducted a simple water mixing calculation to estimate the changes in TDS concentration outside the permit boundary. Based on the groundwater model fluxes, approximately 62 percent of the water in the Rosebud Coal just north of the permit boundary is sourced from spoil. Assuming Spring 7 represents Rosebud Coal water quality in this location, TDS is estimated to increase from 1,165 mg/L to 4,937 mg/L at this location. This corresponds to an increase in specific conductivity from 1,725 μS/cm to 7,310 μS/cm. This represents a change in groundwater class from Class II before mining to Class III after mining, and would result in material damage.

51.    MDEQ had not previously raised any concern with Rosebud Coal water quality

outside of the northern permit boundary in any deficiency letters related to Western Energy's

permit application.  Therefore, Western Energy did not have any opportunity to provide additional data or information related to MDEQ's analysis, modeling, or findings.

52.     MDEQ's findings, as summarized in the CHIA and ROD, are erroneous for several reasons:

a.   MDEQ's referenced regional groundwater model should not have been used for the highly localized evaluation of groundwater north of the permit boundary because this model was not intended for localized water quality evaluations and, instead, was developed to evaluate regional groundwater drawdown (quantity);

b.   MDEQ's water mixing calculation, sourced from the Spring 7, allegedly shows a relationship between total dissolved solids and specific conductance, but fails to provide details that Western Energy can confirm;

c.   MDEQ fails to recognize that Spring 7 water quality is not representative of the groundwater quality of the Rosebud Coal in the area.  First, the data on Spring 7 is variable—it is not Class II all the time, it is sometimes Class III.  Second, Spring 7 is adjacent to an outcrop so likely receives some of its water from local recharge through rainwater, which improves the water quality relative to the groundwater in the coal seam.

d.    MDEQ fails to recognize that Rosebud Coal is generally unconfined near its outcrop and the saturated thickness near the outcrop is typically 3 to 4 feet.  The lack of water column coupled with the low permeability at the monitored wells precludes the development of any viable water supply well for any use, including domestic or stock use.  As a result, it is highly

13

unlikely that drilling a well located just to the north of the permit

boundary into the Rosebud Coal could supply sufficient groundwater for

any useful purpose.  Hence, the application of use classification criteria is

essentially meaningless at this location; and

    e.  MDEQ failed to recognize that most groundwater flow (seepage)

associated from the strata in Section 12 flows easterly as opposed to

northeasterly and, as a result, will be manifested at Spring 7.  Thus, it is

highly unlikely there would be material damage in the Rosebud Coal north

of the permit boundary as purported by MDEQ.

53.    Because MDEQ did not raise the issue of water quality in Rosebud Coal north of

the permit boundary in any deficiency letter, Western Energy was not afforded the opportunity to

raise the above errors to MDEQ before issuance of MDEQ's ROD and CHIA.

**C.    OSM Record of Decision**

54.    On June 28, 2019, OSM posted its June 18, 2019 ROD for the Rosebud Mine

Area F Federal Mining Plan.  The ROD approved Western Energy's mining plan for Area F

without conditions.

55.    Specifically, the ROD selected Alternative 2, as described in the EIS; however,

OSM excluded from Alternative 2 the same 74 acres in Section 12 that MDEQ excluded from its

approval of the mining permit.

56.    Section 3.5.1.2 of the ROD explains:

DEQ concluded in the CHIA that no material damage has occurred
from current or approved mining and that the additional mining
under the proposed project would not create material damage with
the exclusion of 74 acres of Federal coal in T2N, R38E, Section
12, which has not been permitted for mining. On April 18, 2019,
DEQ issued Written Findings and Notice of Decision,
documenting its decision to select Alternative 2 in part and to issue

a surface-mine operating permit for Western Energy's proposed permit Area F that excludes mining of 74 acres of Federal coal in T2N, R38E, Section 12.

57.     OSM's ROD does not address how or if it reviewed and/or confirmed MDEQ's decision to exclude Section 12.  Nor does it address the fact that excluding certain mineable acreage from any of the proposed alternatives was never addressed in the EIS.

58.     OSM merely presents findings that MDEQ's certification that Western Energy's permit application package as technically adequate and acceptable, MDEQ's Written Findings and Notice of Decision, and DEQ's 2018 CHIA constitute compliance with SMCRA.

59.     OSM's ROD recommended to the ASLM approval of Western Energy's mining plan for Area F "without conditions" and instructed that the mining plan could be "implemented following approval of the mining plan by the ASLM."

**D.     OSM Mining Plan Modification Decision**

60.     On June 28, 2019, OSM recommended that the ASLM approve, without special conditions, Western Energy's mining plan for Area F.  OSM's recommendation was based on Western Energy's complete permit application package, compliance with NEPA, documentation ensuring compliance with other Federal laws, regulations and Executive Orders, the findings and recommendations of the BLM regarding Western Energy's Resource Recovery and Protection Plan, and findings and recommendations of MDEQ regarding the state permit application and the Montana State Program.

61.     On July 15, 2019, the ASLM signed the Mine Plan Modification Decision, approving Western Energy's mining plan with the limitation that Western Energy "shall conduct coal development or mining operations only as . . . approved by the Montana Department of Environmental Quality," thus incorporating MDEQ's exclusion of Section 12 from the mining plan.

62.     Neither OSM's June 28, 2019 recommendation nor the ASLM's July 15, 2019

Mine Plan Modification Decision offer any explanation or support for the decision to exclude

Section 12.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violation of APA - Portions of Federal Defendants' ROD are
Arbitrary and Capricious)**

63.     Western Energy incorporates the prior allegations as if fully set forth herein.

64.     The Declaratory Judgment Act empowers the Court to "declare the rights and

other legal relations of any interested party seeking such declaration, whether or not further relief

is or could be sought." 28 U.S.C. § 2201.

65.     Under the APA, a reviewing court shall, inter alia, "hold unlawful and set aside

agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A).

66.     To survive review under the APA's arbitrary and capricious standard, "the agency

must examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of

U.S., Inc.*, 463 U.S. at 43 (internal quotations omitted).

67.     OSM's ROD and the ASLM's Mine Plan Modification Decision erroneously

excluded Section 12 from the Area F mining plan based on its adoption of MDEQ's Written

Findings. The exclusion of Section 12 from the ROD and Mine Plan Modification Decision

lacks support in the EIS as the exclusion of Section 12 was never addressed as an alternative, nor

evaluated to confirm the validity of MDEQ's Written Findings.

68.     Because the portion of the ROD and Mine Plan Modification Decision excluding

74 acres from the mine plan modification is arbitrary and capricious, that portion must be

declared invalid and set aside.  In all other respects, Federal Defendants' actions and approvals

should not be vacated or otherwise set aside.

SECOND CAUSE OF ACTION
**(Violation of NEPA – Failure to Supplement the EIS to Analyze an Alternative that
Considered the Effects of Excluding 74 Acres of Mineable Coal in Section 12)**

69.     Western Energy incorporates the prior allegations as if fully set forth herein.

70.     NEPA requires that the Federal Defendants' EIS examine, among other things,

"alternatives to the proposed action[.]" 42 U.S.C. § 4332(2)(C)(iii).

71.     NEPA regulations require that Federal Defendants "[r]igorously explore and

objectively evaluate all reasonable alternatives," and "[d]evote substantial treatment to each

alternative considered in detail including the proposed action so that reviewers may evaluate

their comparative merits." 40 C.F.R. § 1502.14(a)-(b).

72.     NEPA also requires an agency to supplement its NEPA analysis when there "are

significant new circumstances or information relevant to environmental concerns and bearing on

the proposed action or its impacts." *Id.* § 1502.9(c)(1)(ii).  An agency "[m]ay also prepare

supplements when the agency determines that the purposes of [NEPA] will be furthered by doing

so." *Id.* § 1502.9(c)(2).

73.     "NEPA procedures must insure that environmental information is available to

public officials and citizens before decisions are made and before actions are taken." *Id.* §§

1500.1(b).

74.     Federal Defendants were required to "(a) [m]ake diligent efforts to involve the

public in preparing and implementing their NEPA procedures," to "(b) [p]rovide public notice of

17

. . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected," and to "(d) solicit appropriate information from the public." *Id*. §§ 1506.6(a), (b), (d).

75.     Federal Defendants' ROD impermissibly adopts an alternative (approval of the mining plan modification that excludes approximately 74 acres of minable Federal coal) that was not analyzed in the EIS or disclosed to the public for comment, in violation of NEPA.

76.     Federal Defendants' decision to adopt an undisclosed and new alternative triggered Federal Defendants' duty to prepare a Supplemental EIS for notice and public comment.  *Id*. § 1502.9(c)(1)(i).

77.     Federal Defendants' failure to provide the public, including Western Energy, with sufficient environmental information and an opportunity to submit comments to inform Federal Defendants' decision to adopt an undisclosed, new alternative violates NEPA's public participation requirements.

78.     Because the ROD violates NEPA's public participation and supplementation requirements, it must be declared invalid and set aside to the extent that it excludes 74 acres from the mine plan.  In all other respects, Federal Defendants' actions and approvals should not be vacated or otherwise set aside.

## **PRAYER FOR RELIEF**

WHEREFORE, Western Energy respectfully requests that the Court:

A.     Declare unlawful and set aside as arbitrary and capricious the portion of Federal Defendants' ROD and Mine Plan Modification Decision that excludes 74 acres from Western Energy's mining plan modification for Area F.

B.      Remand the Mine Plan Modification Decision to OSM with instructions to authorize Western Energy to exercise its valid existing rights under federal lease M82186 to mine for and remove coal from the 74 acres improperly excluded.

C.      Decline to vacate the ROD and the Mine Plan Modification Decision in every other respect and allow Western Energy to exercise its valid existing rights pursuant to the existing authorization during the pendency of any remand and/or preparation of any Supplemental EIS.

D.      Issue such additional relief as Western Energy subsequently requests or that this Court may deem just, proper, and equitable.

Dated this 17th day of July, 2019.

*/s/ John C. Martin*
John C. Martin, # 358679
Susan M. Mathiascheck, # 426764
HOLLAND & HART LLP
975 F Street, N.W. Suite 900
Washington, DC 20004
Phone: (202) 654-6915
Fax: (202) 393-6551
jcmartin@hollandhart.com
smmathiascheck@hollandhart.com

Kristina (Tina) R. Van Bockern
(*Pro Hac Vice Pending*)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO  80202
Phone:  (303) 295-8107
Fax:  (720) 545-9952
trvanbockern@hollandhart.com

Hadassah (Dessa) Reimer
(*Pro Hac Vice Pending*)
Holland & Hart LLP
P.O. Box 68
Jackson, WY  83001-0068
Phone:  (307) 739-9741
Fax:  (307) 739-9744
hmreimer@hollandhart.com

**ATTORNEYS FOR PLAINTIFF WESTERN ENERGY COMPANY**

12123476_v5